UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| UNITED STATES OF AMERICA, | CRIMINAL NO. 5:19-101-KKC |
|---|---|
| Plaintiff, | |
| V. | OPINION AND ORDER |
| FNU JOHN SADIQULLAH, | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the defendant Fnu Sadiqullah's motion (DE 55) to revoke the magistrate judge's detention order.

Sadiqullah is charged with one count of conspiring to kidnap certain individuals for ransom in violation of 18 U.S.C. § 1201(c) and one count of conspiring to use interstate facilities in the commission of a murder for hire in violation of 18 U.S.C. § 1958.

The government moved that he be detained pending trial. Pursuant to 18 U.S.C. § 3142(e)(1), a defendant must be detained pending trial if, after a hearing, a judicial officer finds that no condition or combination of conditions will reasonably assure his appearance at future court proceedings and the public safety.

The magistrate judge conducted a detention hearing and determined that the government has presented clear and convincing evidence that Sadiqullah poses a danger to others. Accordingly, the magistrate judge ordered that he be detained pending trial. Sadiqullah then filed this motion, asking the Court to revoke the magistrate judge's detention order.

The Court will conduct a *de novo* review of the magistrate judge's detention order. The statute providing for review of the magistrate judge's detention order does not specifically require that the Court conduct an additional hearing. 18 U.S.C. § 3145(b). In his motion, Sadiqullah does not request a hearing, and he does not rely on or explain evidence not already in the record that he would proffer at a hearing in support of the motion to revoke the detention order. Accordingly, a second detention hearing is not necessary. *See United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir.1987); *United States v.* Jones, No. 12:CR-105, 2012 WL 6737784, at * 1, n.1 (D. Conn. 2012); *United States v. Burks*, 141 F. Supp. 2d 1283, 1285 (D. Kan. 2001);*United States v. Alonso*, 832 F. Supp. 503, 504 (D. Puerto Rico 1993); *United States v. Bergner*, 800 F. Supp. 659, 661 (N.D.Ind.1992).

In resolving this motion, the Court will rely on the affidavits filed in support of the criminal complaints in this matter, the indictment, the Pretrial Services Report prepared by the U.S. Probation Office, the transcript of the detention hearing, and the pleadings submitted by the parties.

Detention is appropriate if the government proves by a preponderance of the evidence that the defendant is a flight risk or if it proves by clear and convincing evidence that the defendant poses a danger to the public or any person. *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004).

In making this determination, the court is to consider "the available information" on the following factors: the nature and circumstances of the offense charged, including whether the offense is a crime of violence; the weight of the evidence against the person; the history and characteristics of the person; and the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g).

As to the nature and circumstances of the offenses at issue here, conspiracy to commit

murder for hire and to kidnap are both serious charges. The murder-for-hire charge carries a possible prison term of 10 years; the kidnapping charge carries a maximum life sentence. Further, both are "crimes of violence." The Bail Reform Act defines a crime of violence as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4)(A),(B). Thus, this factor weights in favor of detention.

As to the weight of the evidence against Sadiqullah, the Court must weigh the evidence regarding the danger Sadiqullah poses to the public or any person, not the evidence of his guilt. *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). In weighing the evidence on this issue, the Court will consider Sadiqullah's personal history and characteristics and the nature and seriousness of any danger to any person or the community posed by his release.

Evidence regarding any danger posed by Sadiqullah is derived largely from the affidavit submitted by Detective William J. Jackson, which was filed in support of the criminal complaint against Sadiqullah, and by the testimony of Detective Jackson at the detention hearing. In his affidavit, Jackson identifies himself as a deputy U.S. Marshal with the Federal Bureau of Investigation and as a detective with the University of Kentucky Police Department. At the detention hearing, Detective Jackson explained that he has been assigned to an FBI Joint Terrorism Task Force. (DE 20, Tr. at 12-13.)

In his affidavit and in his testimony at the detention hearing, Detective Jackson recounted the contents of three recorded conversations between co-defendant Mahmoud Shalash and a confidential source. Sadiqullah was also present for one of those conversations.

3

The first recording was of a meeting that occurred on March 12, 2019 at the Days Motel in Lexington between Shalash and the source. Detective Jackson testified that Shalash owns the Days Motel and that Shalash does business there from about 10 until 5. (DE 20, Tr. at 14-15.)

Detective Jackson testified that, prior to the March 12 meeting, the source and Shalash had been communicating with each other on an unidentified different criminal matter. (DE 20, Tr. at 14.) Detective Jackson testified that, in a phone conversation before the meeting, Shalash stated that he wanted to discuss something with the source that "he didn't want to talk about on the phone." (DE 20, Tr. at 14.) Detective Jackson testified that Shalash informed the source that he had lost money to an individual and wanted the source to get his money back. (DE 20, Tr. at 16.)

Detective Jackson watched the recording of the March 12 meeting live as the meeting was happening. (DE 20, Tr. at 15-16.) In his affidavit, Detective Jackson stated that during the meeting, Shalash informed the source that an individual identified as "Victim #1" owed him $80,000. Shalash told the source Victim #1's telephone number and asked the source to retrieve his money. Shalash also provided the source with contact information for an individual who knew Victim #1.

In his affidavit, Detective Jackson stated that, during the March 12 conversation, the source asked Shalash if he wanted Victim #1's legs broken and Shalash responded "no." The source asked Shalash what he wanted and Shalash responded, "All I want is my money." At the detention hearing, Detective Jackson testified that the source offered to "bodily harm" Victim #1 and that Shalash objected. (DE 20, Tr. at 17.) In addition, Detective Jackson testified that the source asked Shalash if he wanted Victim #1's hand in a box and that Shalash stated he did not want any hands in a box. (DE 20, Tr. at 55.) Likewise, the source

4

asked Shalash if he wanted him to kidnap Victim #1's wife, and Shalash stated that he did not want anyone kidnapped. (DE 20, Tr. at 55.)

In a second recorded conversation between Shalash and the source that occurred on April 15, 2019, however, Detective Jackson testified that Shalash instructed the source to "do whatever you have to do to get my money back." (DE 20, Tr. at 18-19.) Shalash gave this instruction knowing that the source had indicated a willingness to use the violent means to collect debts discussed in the first conversation.

The third recording was of an April 30 meeting between the source and Shalash, which also occurred at the Days Motel. Detective Jackson testified that, during the meeting, the source informed Shalash that he may have located Victim #1. (DE 20, Tr. at 19.) Detective Jackson further testified that Shalash informed the source that Victim #1 had done business with another individual, who Detective Jackson identified at the detention hearing as Victim #2. (DE 20, Tr. at 19-20.) Shalash informed the source that Victim #2 owed money to four men in the community, who he identified as Sadiqullah, co-defendant Abdul Hadi, Azizula Hanafi, and Mohammad Mustafa. Shalash further told the source that if the men found Victim #2, they were going to kill him. (DE 20, Tr. at 20-21, 22.) Detective Jackson testified that Victim #2 reportedly owed about two million dollars to individuals in the community. (DE 20, Tr. at 79.)

After Shalash informed the source about the group of men who wanted to kill Victim #2, the source asked if he could meet with the group. Shalash then called Sadiqullah to come to the meeting "to talk to a guy that could help him get his money back." (DE 20, Tr. at 22, 23.)

Detective Jackson testified that, after Sadiqullah arrived at the April 30 meeting, the source asked him what he wanted done with Victim #2 and Sadiqullah stated, "I want him

5

dead." (DE 20, Tr. at 24.) In his affidavit, Detective Jackson stated that Sadiqullah further stated, "If someone could kill him (Victim #2) for $10,000, we all four will pay someone $10,000." At the detention hearing, Detective Jackson testified that Sadiqullah was referring to himself, Hadi, Hanafi, and Mustafa. Detective Jackson testified that he understood Sadiqullah to be offering the source $10,000 from each man. (DE 20, Tr. at 24-25.) Detective Jackson's affidavit states that, when the source stated that they would have to get the money from Victim #2 before killing him, Sadiqullah stated they did not want him alive anymore.

In his motion, Sadiqullah points out that there is no evidence he actually gave the source money, and there is no written agreement between Sadiqullah and the source. Regardless, Detetective Jackson testified that Sadiqullah offered the source money in exchange for killing Victim #2. That is sufficient evidence of danger to the community. There need not be an actual exchange of money or a written agreement.

Detective Jackson testified that, on May 2, the source reported that Sadiqullah had called the source to report that he and others had "captured" Victim #2 at his place of business, 20 Dollar Tires in Lexington. (DE 20, Tr. at 26, 35-36.) The source stated that Sadiqullah had asked the source to come to Lexington to "take care of" Victim #2. (DE 20, Tr. at 27.) The source told Sadiqullah that he was not in the area and could not come. He also instructed Sadiqullah not to harm Victim #2. (DE 20, Tr. at 27.) Later, Sadiqullah called the source and, according to the source, stated that the men no longer had Victim #2 "captured", and they were now looking for him. (DE 20, Tr. at 27.)

Detective Jackson testified that his investigation revealed that the confrontation happened inside Victim #2's business, and that it got "heated." (DE 20, Tr. at 36.) The three men left the store and went to a car to call the source. (DE 20, Tr. at 36, 70.) They stayed in

6

the parking lot for about an hour. (DE 20, Tr. at 36.)

Detective Jackson and other law enforcement officers then located Victim #2 and interviewed him. Victim #2 informed the officers that Sadiqullah, Hadi, and Hanafi had arrived at his place of business in Lexington and "confronted him about the money." (DE 20, Tr. at 27.) Detective Jackson testified that Victim #2 described the meeting as "very menacing." (DE 20, Tr. at 27.) Victim #2 stated that his son was present at the place of business when the men arrived, and that Sadiqullah stated, "We know you have a son. We know where your family lives." (DE 20, Tr. at 28.)

Victim #2 also reported that, about three weeks before the confrontation, Hadi, Hanafi, and Mustafa traveled from Lexington to Victim #2's residence in a gated community in Florida and confronted him on his porch. (DE 20, Tr. at 29.) Victim #2 understood that the three "used a ruse" to get into the gated community. He reported they were there for about an hour and demanded that he return their money. (DE 20, Tr. at 29.) Victim #2 stated that, after the confrontation, Hadi sent a text message to Victim #2's wife stating that the men knew where the family lived and that he would return if he did not get his money. (DE 20, Tr. at 28.) Victim #2 stated that Hadi also sent Victim #2's wife a message through Facebook Messenger stating, "Go anywhere. I will find you." (DE 20, Tr. at 28.) In his affidavit, Detective Jackson stated that Victim #2 also stated that he received text messages from Hadi on April 30, 2019 in which Hadi told Victim #2 "not to fuck with him" or Hadi would return.

In his affidavit, Detective Jackson stated that, during the April 30, 2019 meeting, Sadiqullah told the source that Hadi, Hanafi, and Mustafa had found Victim #2's house in Florida and discovered that Victim #2 had a lot of gold and diamond rings and that he drove a Range Rover.

7

Detective Jackson testified that the officers then arrested Shalash, Sadiqullah, and Hadi. (DE 20, Tr. at 30.) Hadi gave two statements to the FBI, both of which were recorded. (DE 20, Tr. at 88.) Detective Jackson testified that Hadi informed the officers that Sadiqullah told him that he had met a person who could help them recover money from Victim #2. (DE 20, Tr. at 32.) Hadi told the officers that he understood that the person Sadiqullah met would "perhaps bind" Victim #2 and "beat him potentially to death." (DE 20, Tr. at 32.) Hadi informed the FBI that he had gone to Victim #2's business. (DE 20 Tr. at 89.)

In an affidavit accompanying the complaint against Hadi, FBI Special Agent Andre S. Mugnier states that Hadi told the officers that he observed Sadiqullah call the source from the parking lot at Victim #2's place of business to ask him to force Victim #2 to return the funds. Agent Mugnier states that Hadi told the officers that Sadiqullah told him that Sadiqullah had discussed an arrangement with the source under which the men would pay the source 30 percent of the amount that Victim #2 owed the men.

There is no evidence that Sadiqullah has committed any crime prior to the incidents alleged in the indictment. Nor is there any evidence of a history of substance abuse, mental illness, or violence. Moreover, Sadiqullah served as a translator for the United States military in Afghanistan, and for that work he was granted status as a lawful permanent resident in this country.

Nevertheless, the Court cannot overlook the evidence that Sadiqullah directly offered a person cash in exchange for the murder of another person. Sadiqullah states in the recordings that he wants Victim #2 dead. Sadiqullah argues that he took no action toward the murder or kidnapping of Victim #2. But there is evidence that, after agreeing to pay the source to kill Victim #2, Sadiqullah traveled to Victim #2's place of business and then called

8

the source and instructed him to come to Victim #2's business to take care of Victim #2.

This is clear and convincing evidence that, if not confined pending trial, Sadiqullah poses a serious danger to the community, particularly to Victim #2 and his family and to the source. Sadiqullah argues that electronic monitoring of his location would assure that he maintains a safe distance from Victim #2. But there is evidence that Sadiqullah was willing to engage a third person to harm Victim #2. Electronic monitoring would not assure the safety of the source or Victim #2 in these circumstances.

Considering all the factors set forth in 18 U.S.C. § 3142(g), the Court finds by clear and convincing evidence that there are no conditions that could reasonably assure the safety of the public – particularly Victim #2, his family, and the source – if Sadiqullah were released.

Accordingly, the Court hereby ORDERS that Sadiqullah's motion to revoke the magistrate judge's detention order (DE 55) is DENIED.

Dated August 21, 2019

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY